## GARRISON, WRIGHT & CO. v. UNITED STATES.

(Circuit Court, S. D. New York. February 19, 1903.)

### No. 2,933.

---

## THE C. J. RENO.

(District Court, N. D. New York. February 27, 1903.)

**1. COLLISION—STEAMER AND FERRYBOAT CROSSING—VIOLATION OF RULES.**

A ferryboat was crossing the Hudson river to Albany on her usual course, which was slightly down the river, when a steamer with tows was coming up near the west side. The ferryboat gave a signal of one whistle, indicating her intention to keep her course, which she had a right to do as the privileged vessel, and after stopping and receiving no answer she proceeded. The steamer neither saw the ferryboat, although in plain sight, nor heard her signal, and kept her course until it was too late to avoid collision. *Held,* that the steamer was in fault for

negligent navigation, and the violation of rule 2 of the navigation rules, which required her, having the ferryboat on her own starboard side, to keep out of the way and direct her course to starboard; that the ferryboat was not in fault, being the privileged vessel, and required by the same rule to keep her course and speed.

In Admiralty. Suit for collision.

Worthington Frothingham, for libelant.

J. M. & J. A. Lawson, for respondent and claimant.

RAY, District Judge. The libel in this case was filed April 9, 1902. On the 3d day of April, 1902, the libelant, Edward C. White, was the owner of a ferryboat, the Maid of Perth, and engaged in making regular trips across the Hudson river from Bath on the Hudson, or Rensselaer, to the city of Albany. Bath is on the easterly side of the river, and Albany on the westerly side. The ferry slips at these points were nearly opposite, the slips at Albany being in the neighborhood of 300 feet southerly of that at Bath, or Rensselaer. At this place the river is about 1,255 feet in width, and the trip across the ferry occupies about 2½ to 3 minutes under ordinary circumstances; on this occasion, owing to a flood, probably about 5 minutes. The ferryboat Maid of Perth took her usual course across the river, and the tug, being on its way up the river with its tows, three canalboats, and on the west side, was in, or soon would be in or across, her course. The ferryboat blew one blast of her whistle, when about half way across, and this signal indicated that the ferryboat had the right to and intended to keep her course. Her engine was then stopped awaiting the signal of the Reno as to what it would do. No signal was given by the Reno, and this indicated it would pass astern the ferryboat. The Maid of Perth then resumed her course.

There is much conflict in the evidence as to what occurred after this. It is asserted, on the one hand, that the Reno did nothing to indicate that she would keep on her course up the river on the westerly side, and that the Maid of Perth had every reason to believe that the tug would go to the right and allow her to pass on her course to her berth or slip on the Albany side, and that, therefore, she kept on her course, and only discovered the danger, and that the Reno was not intending to change its course, when too late to avert the collision, although she did everything in her power to do so. On the other hand, the Reno claims that she was misled, by the stopping of the Maid of Perth, into the belief that it (the Reno) would be allowed, and was expected to continue, on the course it was pursuing, and that, therefore, it did so, but stopped and backed at the earliest possible moment, when the danger was discovered, and did all it could to avert the danger and the collision. Much of the evidence given in its behalf is, however, confused and contradictory.

When the Maid of Perth gave her signal, it was the duty of the Reno to answer promptly, and, if it intended to keep its course, to plainly indicate the fact. This it did not do. Considering the distance to be traveled, both boats were moving rapidly, but not at an improper or an unusual rate of speed. The Reno is not excused because those in charge of her did not see the Maid of Perth or hear her

signal. The signal could have been heard by them if paying attention, and the vessel was in plain view of all observers. The Reno knew her usual course across the river. Those in charge of her were bound to be observant and diligent at this place.

The Reno had abundant time, opportunity, and space to avoid the Maid of Perth, but failed to exercise and use reasonable care and diligence so to do. The Reno could see and must have seen that the Maid of Perth was on her own course, was being forced by a rapid and unusual current down the stream against which she was making head, and at the same time making direct for her Albany slip. The Reno had no right to believe, and could not have believed, that the ferryboat would turn aside unless forced to do so or warned to do so in time. The warning was not given, at least until the ferryboat and tug were nearly in collision, and then it was too late for either party, do what they would, to avert coming in contact.

The evidence preponderates quite strongly in favor of the libelant, and on the whole evidence I am convinced and compelled to find, and do find, that the Maid of Perth was free from wrong or negligence contributing to the collision and consequent damage, and that same was caused by the negligence and improper and careless management, if not willful wrong, of the Reno or those in charge of it. The Reno did nothing, or substantially nothing, to denote that it was confused or uncertain as to the purpose of the Maid of Perth, as indicated by her keeping a direct course for her Albany slip. It is evident the Reno desired to hug the westerly shore, and keep out of the current near midstream, but negligently failed to give proper or timely warnings of her purpose, and that, as a result, the Maid of Perth was run into and sunk. The Reno acted in plain violation of the rules of navigation applicable in such a case. Rule 11:

"When steamers are approaching each other in an oblique direction, as shown in the diagrams of the fourth and fifth situations, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other, which latter vessel shall keep her course and speed; the stream vessel having the other on her starboard side indicating by one blast of her whistle her intention to direct her course to starboard, so as to cross the stern of the other steamer; and two blasts, her intention of directing her course to port, which signals must be promptly answered by the steamer having the right of way, but the giving and answering signals by a vessel required to keep her course shall not vary the duties and obligations of the respective vessels. When steamers are approaching each other in an oblique direction, as indicated in the diagrams of the fourth and fifth situations, so that a continuation of their courses would involve risk of collision, the vessel which has the other on her starboard side shall keep out of the way of the other, and shall, if necessary to do so, slacken her speed, or stop and reverse, indicating her intention by either one or two blasts of the whistle, as the circumstances may require."

The value of the ferryboat was in the neighborhood of $2,000, but no finding is made as to value.

It follows that the libelant is entitled to a decree that the damages, when ascertained, be paid by the tug Reno or its owner, and that said steam tug be condemned and sold to pay the same. An interlocutory judgment will be prepared in accordance with these findings, and it will be referred to a commissioner to take proof of the amount of damages.

Newton B. Van Dorzee is named as such commissioner, unless there be serious objections. Let the proper findings and judgment be drawn, and submitted to me for signature.